**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

**United States of America,**

**Plaintiff,**

**v.**

**Marco Orlando Tinnin (06), Danta Franks (12), and Darrel Robinson (15),**

**Defendants.**

**Criminal No. 07-439 (JNE/SRN)**

**REPORT AND RECOMMENDATION**

---

Leshia Lee-Dixon, Office of the United States Attorney, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, for Plaintiff United States of America

John Hughes, Law Office of John Hughes, 247 Third Avenue South, Minneapolis, Minnesota 55414, for Defendant Marco Orlando Tinnin

Steve Bergeson, Tuttle & Bergeson, 1275 Ramsey Street, Suite 600, Shakopee, Minnesota 55379, for Defendant Danta Franks

William Selman, III, Selman Law Office, 250 Second Avenue South, Suite 205, Minneapolis, Minnesota 55401, for Defendant Darrel Robinson

---

SUSAN RICHARD NELSON, United States Magistrate Judge

The above-captioned case comes before the undersigned United States Magistrate Judge on Defendant Marco Orlando Tinnin's Motion to Suppress Statements (Doc. No. 183), Defendant Marco Orlando Tinnin's Motion to Suppress Electronic Surveillance and Wiretapping (Doc. No. 262), Defendant Danta Franks' Motion to Suppress Admissions or Confessions (Doc. No. 313), Defendant Danta Franks' Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 314), Defendant Danta Franks' Motion to Dismiss Indictment as Insufficient (Doc. No. 356), Defendant Darrel Robinson's Motion to Suppress Evidence from Search and Seizure (Doc. No. 215), Defendant Darrel Robinson's Motion to Suppress Statements

(Doc. No. 216), and Defendant Darrel Robinson's Motion to Suppress Electronic Surveillance Evidence (Doc. No. 217).[1] This case has been referred to the undersigned for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1.

## I. BACKGROUND

An Indictment was filed on December 4, 2007, charging Defendants Marco Orlando Tinnin, Danta Franks, and Darrel Robinson, along with eighteen other individuals, with conspiracy to distribute, and possess with the intent to distribute, crack cocaine and cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. Defendant Tinnin was also charged with numerous other counts of distributing crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B), and 18 U.S.C. § 2. Defendant Franks was charged with one such count of distributing crack cocaine, and Defendant Robinson was charged with three such counts.

This Court held a pretrial motions hearing on February 4, 2008, at which United States Bureau of Alcohol, Tobacco, and Firearms (ATF) Agents Peter Vukovich and Calvin Meyer testified. The Court also received sixteen exhibits into evidence.

## II. FACTS

The following facts were elicited from the testimony and exhibits introduced at the motions hearing.

Agent Meyer has worked at the ATF for approximately seven years. He is presently assigned to the Minneapolis Police Department's Violent Offender Task Force. Before working at the ATF, Agent Meyer worked as a police officer and a Deputy U.S. Marshal. His previous

[1] The Court will address Defendants' pending non-dispositive motions in a separate Order.

experience with wiretap investigations includes assignments as a co-case agent, an administrative agent, and a wire monitor. Agent Meyer was the case agent on two wiretaps used in the investigation of this case. In that capacity, Agent Meyer managed the overall investigation, submitted affidavits in support of the wiretap applications, reviewed documents relating to the monitoring of the wire, and reviewed the "ten-day reports" submitted to the court.[2]

**A. The Randle Wiretap**

The first wiretap obtained in the investigation of this case targeted Timothy Karrem Randle, Ennis Orlando Fitzgerald, Detrick Darnell Jiles, and Tonney Jamal Randle ("the Randle wiretap"). (Gov't Ex. 6.) The primary objectives of the investigation were to determine the scope of a conspiracy to distribute crack cocaine, the sources of the crack cocaine, and the customers of Timothy Randle and his associates. Before applying for the Randle wiretap, investigating officers employed techniques such as the use of confidential informants, controlled buys, surveillance, pen registers, and search warrants. These efforts were not successful in achieving the broad goals of the investigation. For example, the informants were not able to purchase any more than small amounts of crack cocaine, and searches of Timothy Randle's residence and the home of Ennis Fitzgerald yielded no crack cocaine and only minimal evidence of narcotics trafficking. In early October 2007, Agent Meyer determined that the investigation had stalled, and he decided to seek a wiretap for Timothy Randle's phone.

Agent Meyer prepared a forty-three page affidavit in support of the wiretap application, which described the investigation in extensive detail. (Gov't Ex. 6.) Agent Meyer explained

[2] The Honorable James M. Rosenbaum, Chief Judge, United States District Court for the District of Minnesota.

that in February 2007, a confidential informant (CI) had provided information that a group of family members was distributing narcotics in Minneapolis. The CI named Timothy Randle, Ennis Orlando Fitzgerald, Detrick Darnell Jiles, and Tonney Jamal Randle. Other CIs corroborated this information by providing information and making controlled purchases. Agent Meyer further explained in his affidavit that the interception of wire communications was necessary to determine the scope of the conspiracy, the sources of narcotics, the identities of customers, the management and disposition of narcotics sale proceeds, and the identities of other members of the conspiracy. He stated that surveillance had not been effective due to counter-surveillance techniques. Similarly, mobile tracking devices had not been helpful in determining the identity of co-conspirators or the full scope of the conspiracy, and search warrants had not yielded significant information. Agent Meyer concluded that electronic surveillance was the only method likely to attain the goals of the investigation.

On October 9, 2007, Agent Meyer and Assistant U.S. Attorneys Jeffrey Paulsen and Leshia Lee-Dixon presented the wiretap application to Judge Rosenbaum. Although Judge Rosenbaum had previously reviewed the application and affidavit, he reviewed it again, and then asked whether law enforcement was close to arresting Timothy Randle. Agent Meyer said no, and Judge Rosenbaum signed the order for the Randle wiretap. (Gov't Ex. 6.)

Calls to and from Timothy Randle's telephone number were monitored using a voicebox in the ATF office. Prior to the interception of calls, Agent Meyer conducted a meeting with the law enforcement officers who would be surveilling, monitoring, or otherwise participating in the

investigation.[3] At the beginning of the meeting, Agent Meyer gave the officers copies of his affidavit and a memorandum setting forth the rules and procedures for minimizing calls. (Gov't Ex. 7.) The monitors were instructed to minimize calls involving the attorney-client privilege, spousal privilege, and clergy privilege as soon as the privileged nature of the call was determined. Mr. Paulsen also summarized the investigation, read the minimization memorandum, and explained the minimization procedures to be followed. The monitors learned how to use the voicebox, what to do when a call was initiated or received, and how to minimize a call. Specifically, an alarm would signal when a call was made or received. The monitor would then click an icon on the voicebox, and a clock would appear on the screen. The monitor would have up to two minutes to determine whether the call was criminal in nature or "pertinent." When the call neared two minutes in length, or if the monitor determined that the call was not pertinent, he or she would click another icon to minimize the call. Once a monitor minimized a call, the recording would cease. However, the monitor could spot-check a minimized conversation to determine if it had become criminal in nature. All of the officers who received minimization training signed a minimization log. (Gov't Ex. 8.)

One of Agent Meyer's duties during the course of the Randle wiretap was to review the ten-day reports submitted to Judge Rosenbaum. (Gov't Ex. 9.) The purpose of these reports was to inform the court of the investigation's progress specific to the wiretap, such as whether the calls were criminal in nature, how many of the calls were "pertinent" to the investigation, and how many calls were being minimized or deemed privileged. Although the goals of the

---

[3] Only two or three people who ultimately participated in the monitoring did not attend this meeting, but before they monitored any calls, they were required to read the memorandum and affidavits and to speak with Agent Meyer and Mr. Paulsen.

investigation were not achieved in the first ten or twenty days of the wiretap, Agent Meyer felt that the goals were largely achieved after thirty days, and he decided not to seek further monitoring of Timothy Randle's phone. On November 9, 2007, Judge Rosenbaum signed an order sealing the CD that contained the recorded phone calls. (Gov't Ex. 10.)

On October 25, 2007, while monitoring pursuant to the Randle wiretap was underway, the Government learned that its application for the wiretap contained an incorrect designation order, due to an administrative error by the Office of the Attorney General. The Office of the Attorney General issues designation orders to authorize certain Criminal Division officials to apply for wiretaps. The Government's application for the Randle wiretap referred to and attached Order No. 2758-2005, dated February 24, 2005. This order had been revoked, however, by Order No. 2887-2007, issued on July 3, 2007. The only substantive difference between Order No. 2758-2005 and Order No. 2887-2007 was an expansion of the list of authorized officials, to include not only the previously designated Criminal Division officials but also their counterparts at the recently-created National Security Division. There was no change made to the list of designated Criminal Division officials.

When the Government applied for the Randle wiretap, it did not know that Order No. 2758-2005 had been revoked. Immediately upon learning of the mistake, the Government filed a motion to amend nunc pro tunc its application and the court's authorization order, to attach the current designation order. (Gov't Ex. 14.) Judge Rosenbaum granted the motion and amended the October 9, 2007 order accordingly.

**B. The Tinnin Wiretap**

During the course of the Randle wiretap, monitors captured 2,886 calls relating to

Defendant Tinnin. Agent Meyer determined from those calls that Defendant Tinnin was selling crack cocaine. Although Agent Meyer believed he had sufficient evidence to arrest Defendant Tinnin at that time, he decided to continue the investigation in order to determine the full scope of Defendant Tinnin's drug distribution scheme, his sources of crack cocaine, the personnel involved in the conspiracy, his customers, and the management and disposition of the organization's proceeds.

Before applying for the wiretap on Defendant Tinnin's phone ("the Tinnin wiretap"), Agent Meyer obtained a pen register for Defendant Tinnin's phone number and a tracking device for one of his vehicles. However, Agent Meyer did not have any confidential informants who could purchase narcotics directly from Defendant Tinnin. Agent Meyer also knew from past experience that visual surveillance alone would not be effective in determining Defendant Tinnin's sources. He concluded that no other investigatory techniques would provide the information he sought, and he therefore decided to seek authorization for a wiretap on Defendant Tinnin's phone.

As before, Agent Meyer prepared an affidavit and included all of the details of the investigation. (Gov't Ex. 11.) He explained that his knowledge was based primarily on conversations between Timothy Randle and Defendant Tinnin, which were intercepted pursuant to the Randle wiretap. Agent Meyer attached his affidavit in support of the Randle wiretap to his affidavit for the Tinnin wiretap and incorporated it by reference. In his separate, twenty-one page affidavit for the Tinnin wiretap, Agent Meyer described surveillance undertaken by officers, which led to the identification of Defendant Tinnin's vehicle and residence, and indicated that Defendant Tinnin was selling crack cocaine. Based on the intercepted

conversations and the surveillance, Agent Meyer concluded that Defendant Tinnin was one of Timothy Randle's sources. Agent Meyer described the typical arrangement between Defendant Tinnin and Timothy Randle. Timothy Randle would call Defendant Tinnin's telephone and tell him in code the quantity of crack cocaine he wanted to purchase. Defendant Tinnin would then tell Timothy Randle where to meet him to conduct the transaction.

Agent Meyer then explained in his affidavit the precise need to electronically intercept wire communications from Defendant Tinnin's phone. He stated that the Randle wiretap had been useful, but had not provided law enforcement with the full scope of Defendant Tinnin's involvement in the drug distribution conspiracy. Agent Meyer needed to obtain more evidence on the scope, extent, and personnel involved with the conspiracy; the identities of Defendant Tinnin's suppliers, main customers, and co-conspirators; and how the organization's proceeds were managed and distributed. Agent Meyer explained that further surveillance would be of limited value because surveilling officers were often detected; Defendant Tinnin owned several vehicles and would frequently change cars to avoid detection; video surveillance images obtained at night were of poor quality; and visual evidence needed to be supported by auditory proof that could only be obtained from wire intercepts. In addition, although officers had obtained a tracking device for one of Defendant Tinnin's cars, they had not been able to locate the car and put the device on it. Agent Meyer explained that search warrants would not be effective because law enforcement had no sources of information or informants to provide probable cause to search a specific location connected with Defendant Tinnin. Similarly, Agent Meyer thought that a trash search would be futile because such a search typically yields limited results and is used to obtain a search warrant for only a single residence, which would not aid

law enforcement in its broad goals. Officers had not subpoenaed possible co-conspirators to testify before a grand jury because, in Agent Meyer's experience, such individuals invoke their Fifth Amendment right not to testify. In addition, if alerted to an ongoing investigation, such individuals become more cautious in their activities or even flee.

On November 8, 2007, Agent Meyer and Mr. Paulsen officially presented the application and affidavit for the Tinnin wiretap to Judge Rosenbaum. After reviewing the materials, Judge Rosenbaum signed the order authorizing the wiretap. (Gov't Ex. 11.)

Law enforcement began monitoring Defendant Tinnin's phone that day, using the same personnel that had monitored Timothy Randle's phone. As before, Agent Meyer provided ten-day reports to Judge Rosenbaum, including information on pertinent, non-pertinent, minimized, and privileged calls. (Gov't Ex. 12.) Monitors intercepted forty-six phone calls between Defendant Tinnin and Defendant Franks and sixty-four calls between Defendants Tinnin and Defendant Robinson. The monitoring ceased on December 5, 2007, when Agent Meyer thought that the objectives of the investigation had been largely achieved. Judge Rosenbaum subsequently sealed the CD that contained the intercepted calls. (Gov't Ex. 13.)

**C. Defendant Tinnin's Statement to Law Enforcement**

Defendant Tinnin was arrested early in the morning on December 6, 2007, pursuant to an arrest warrant. At approximately 7:00 a.m., he was interviewed by Agent Vukovich and Officer John Biederman at the police station. Officer Biederman read Defendant Tinnin his Miranda rights from a card, and Defendant Tinnin agreed to waive his rights and speak with the officers.

Defendant Tinnin signed an advice of rights and waiver form to that effect.[4] (Gov't Ex. 2.) At no time did Defendant Tinnin seek to end the interview or ask for an attorney.

### D. Defendant Robinson's Statement to Law Enforcement

No testimony was offered with respect to Defendant Robinson's statement. The Government offered a video recording of the interview for the Court's consideration. (Gov't Ex. 1.)

Defendant Robinson was arrested pursuant to an arrest warrant on December 6, 2007. Officer Biederman and another officer introduced as "Jason" interviewed Defendant Robinson at the police station. Officer Biederman began by telling Defendant Robinson that he would explain why Defendant Robinson had been arrested after he administered a Miranda warning. Officer Biederman then read Defendant Robinson his Miranda rights from a card. Officer Biederman asked Defendant Robinson if he understood his rights, and Defendant Robinson nodded and said yes. Officer Biederman asked Defendant if he wanted to speak about "this issue," to which Defendant replied that he did not know what "the situation" was. Officer Biederman suggested that before they discussed any substantive matters, Defendant Robinson would have to agree to talk. Defendant Robinson repeated that he did not know what Officer Biederman wanted to talk about. Officer Biederman then suggested that Defendant Robinson ask him a few questions. Defendant Robinson said, "'kay," and asked why he was in custody. Officer Biederman told Defendant Robinson that he had been arrested pursuant to a federal arrest

[4] Defendant Tinnin signed the form as "Marco Jeanpierre." At the motions hearing, Defendant Tinnin introduced a copy of a marriage certificate showing that he married a woman named Carmelita Lashun Jeanpierre in 2002. (Def. Ex. 1.) Defendant Tinnin conceded at the hearing that he occasionally uses the name "Marco Jeanpierre."

warrant. Defendant Robinson laughed.

Officer Biederman changed the subject and asked Defendant Robinson questions such as his name, date of birth, phone number, employment, and where he was originally from, all of which Defendant Robinson readily answered. Officer Biederman also asked about Defendant Robinson's connection with 812 44th Avenue North, which Defendant Robinson said was his girlfriend's house. Defendant Robinson also gave his girlfriend's name and employment information.

Officer Biederman then said he wanted to "get to the nuts and bolts of this," and he mentioned that some crack cocaine had been seen "up there," presumably at Defendant Robinson's girlfriend's home. Defendant Robinson said, "yeah," and admitted to doing a "little hustling." Upon further questioning, Defendant Robinson also acknowledged that a shotgun was in the home, and that a small amount of crack cocaine was at his home at 1522 LaSalle Avenue South. Officer Biederman asked Defendant Robinson to identify the source of his crack cocaine, and Defendant Robinson shrugged. Officer Biederman showed Defendant Robinson several photographs of people he might or might not know, but Defendant Robinson did not identify anyone. Officer Biederman then said he believed that Defendant Robinson got his crack cocaine from "Marco." He told Defendant Robinson that law enforcement officers had been monitoring a wiretap and had learned of Defendant Robinson's drug trafficking activities. Officer Biederman explained to Defendant Robinson that he had been charged with conspiracy in federal court and that he was facing ten years on the conspiracy charge and five years for possessing a gun. Officer Biederman then played some of the recorded phone calls to Defendant Robinson. Officer Biederman said that the matter was not going away, and that there were only a couple of

things Defendant Robinson could "do to reduce." Defendant Robinson maintained that he did not know "Marco" and that he was only a small-time dealer. Officer Biederman left the room for a few minutes to let Defendant Robinson "think about [the] situation."

When Officer Biederman returned, Defendant Robinson disclaimed any knowledge of "those people." Defendant Robinson later said that his brother had introduced him to "Marco" in 1992, but that he was just a friend. Officer Biederman reminded Defendant Robinson that he could be charged with the entire amount of drugs involved in the conspiracy. After some further trivial discussion, Officer Biederman left the room again. When Officer Biederman returned, he frisked Defendant Robinson for the keys to his apartment but did not find them. Officer Biederman left the room again, and after a time, Defendant Robinson laid down on the floor to rest. When Officer Biederman returned, he handcuffed Defendant Robinson and removed him from the room.

## III. DISCUSSION

### A. Defendant Tinnin's Motions

Defendant Tinnin moves to suppress his statement and evidence obtained from electronic surveillance. At the motions hearing, he clarified that his motion to suppress statements was contingent on his motion to suppress the wiretap evidence.

#### 1. Necessity

In Defendant Tinnin's post-hearing memorandum, he argues that Agent Meyer did not meet the "necessity" requirement in his affidavit in support of the Tinnin wiretap. Specifically, Defendant Tinnin faults Agent Meyer for not using investigative techniques such as surveillance, confidential informants, search warrants, trash searches, and grand jury subpoenas of co-

conspirators. Defendant Tinnin also characterizes Agent Meyer's affidavit as boilerplate and conclusory, and he contends that Agent Meyer wrongfully relied on the necessity showing for the Randle wiretap in his affidavit for the Tinnin wiretap.

An application for interception of wire communications must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). The intent of the requirement is "to restrict wiretaps to those which are necessary as well as reasonable." United States v. Daly, 535 F.2d 434, 438 (8th Cir. 1976). However, "Congress did not require the exhaustion of 'specific' or 'all possible' investigative techniques before wiretap orders could be issued." Id. (citation omitted). The Eighth Circuit views the purpose of the necessity requirement as an assurance "that wiretaps are not routinely employed as the initial step in an investigation." United States v. Macklin, 902 F.2d 1320, 1326 (8th Cir. 1990) (citing Daly, 535 F.2d at 438). Thus, while law enforcement officers must first attempt some typical investigative techniques, they are not required to exhaust all possible investigative techniques. Id. (citations omitted).

Agent Meyer clearly did not use the Tinnin wiretap as the initial step in his investigation of Defendant Tinnin and his role in the drug distribution scheme. The investigation began during the monitoring of the Randle wiretap, when monitors intercepted 2,886 calls relative to Defendant Tinnin. These calls revealed that Defendant Tinnin was selling crack cocaine to Timothy Randle. Before Agent Meyer applied for the Tinnin wiretap, he obtained a pen register for Defendant Tinnin's phone number and a tracking device for one of his vehicles. Officers also conducted surveillance of Defendant Tinnin.

Despite these investigative techniques, Agent Meyer was not able to learn the extent of Defendant Tinnin's participation in the conspiracy or his sources of crack cocaine. As Agent Meyer fully explained in his affidavit, the investigative measures that had been utilized were of limited or no value, and other traditional investigative techniques were unlikely to succeed. Law enforcement had not learned of any confidential informants who could purchase narcotics directly from Defendant Tinnin. Further surveillance was not likely to be effective because of frequent detection and Defendant Tinnin's evasive methods. Moreover, mere visual surveillance without auditory substantiation was of limited value, and images obtained at night were of poor quality. In addition, although officers had obtained a tracking device for one of Defendant Tinnin's cars, they had not been able to place the device on it. Agent Meyer thought that search warrants would not be useful because officers had no probable cause to search a specific location connected with Defendant Tinnin. A trash search would not be effective because such searches typically yield limited results and are generally used for a single residence, which would not aid law enforcement in achieving its overall objectives. Officers had not subpoenaed possible co-conspirators to testify because such individuals likely would invoke their Fifth Amendment right not to testify and would become more cautious in their dealings with Defendant Tinnin. The Court finds that Agent Meyer's affidavit more than sufficiently described how other investigative procedures had been tried and failed, or why such procedures were unlikely to succeed in meeting the objectives of the investigation.

Contrary to Defendant Tinnin's contention, Agent Meyer's affidavit was neither boilerplate nor conclusory; rather, it was specific to the investigation of Defendant and provided thorough and detailed information. In addition, Agent Meyer did not act inappropriately in

attaching and incorporating by reference his affidavit in support of the Randle wiretap. Both wiretaps related to the same investigation, and the first affidavit provided context for the second. Finally, Agent Meyer did not rely on the necessity showing for the Randle wiretap to support the application for the Tinnin wiretap. His affidavit supporting the Tinnin wiretap sufficiently established necessity for the wiretap on its face.

**2. Authorization**

As a second ground for suppressing evidence seized from the Tinnin wiretap, Defendant Tinnin argues that the Government's application for the Randle wiretap was not approved with the requisite authority under 18 U.S.C. § 2516 because the original application included an expired designation order. Defendant Tinnin does not address the effect of the nunc pro tunc amendment.

"The function of a nunc pro tunc order is to correct clerical or ministerial errors, including typographical errors, or to reduce an oral or written opinion to judgment; the function is not to make substantive changes affecting a party's rights." United States v. Suarez-Perez, 484 F.3d 537, 541 (8th Cir. 2007). Here, the Office of the Attorney General failed to provide a current designation order to the U.S. Attorney's Office in this District. This was a ministerial error. When the Government applied for the Randle wiretap, it did not know that Order No. 2758-2005 had been revoked. More importantly, however, even though Order No. 2758-2005 had been revoked, it nevertheless conformed to 18 U.S.C. § 2516, which requires that a wiretap application be authorized by "[t]he Attorney General, Deputy Attorney General, Associate Attorney General, or any Assistant Attorney General, any acting Assistant Attorney General, or any Deputy Assistant Attorney General or acting Deputy Assistant Attorney General in the

Criminal Division or National Security Division specially designated by the Attorney General." As explained in the affidavit of John C. Kenney, a Deputy Assistant Attorney General, Order No. 2758-2005 was revoked only because the Attorney General had expanded the list of authorized officials to include not only the previously included Criminal Division officials but also their counterparts at the recently-created National Security Division. (Gov't Ex. 15.) There was no substantive change made to the list of designated Criminal Division officials, and the nunc pro tunc amendment therefore did not affect Defendant Tinnin's substantive rights.

Even without the nunc pro tunc amendment, however, the inclusion of the revoked designation order in the application would not warrant suppression of evidence seized pursuant to the wiretap. Under 18 U.S.C. § 2518, there are three potential grounds for suppression of wiretap evidence: (1) that "the communication was unlawfully intercepted;" (2) that "the order of authorization or approval under which it was intercepted is insufficient on its face; or" (3) that "the interception was not made in conformity with the order of authorization or approval." 18 U.S.C. § 2518(10)(a). In United States v. Chavez, the United States Supreme Court considered whether wiretap evidence should have been suppressed because the application and order incorrectly identified an Assistant Attorney General as the authorizing official rather than the Attorney General. 416 U.S. 562, 565 (1974). The Court acknowledged that the misidentification technically contravened 18 U.S.C. § 2518(1)(a) and (4)(d), which expressly require the application to identify the authorizing officer. Id. at 570.

> But it does not follow that because of this deficiency in reporting, evidence obtained pursuant to the order may not be used . . . . There is no claim of any constitutional infirmity arising from this defect, nor would there be any merit to such a claim, and we must look to the statutory scheme to determine if Congress has provided that suppression is required for this particular procedural error.

Id. The failure to correctly identify the authorizing individual, "when in fact" the Attorney General had approved the application, did not warrant suppression. Id. at 571.

The Chavez Court also clarified that the challenge to the wiretap did not implicate the facial sufficiency clause of § 2518(1)(a), but rather, the unlawful interception clause. Id. at 573-74, 579. Even so, the misidentification did not render the interception unlawful, considering the purpose of the identification requirement in the statutory scheme. Id. at 574, 579.

In this case, the Court finds that the authorization order of October 9, 2007, is not facially insufficient. The order refers to an application "authorized by a duly designated official of the Criminal Division . . . pursuant to the power delegated to that official by special designation of the Attorney General and vested in the Attorney General by Section 2516 of Title 18, United States Code . . . ." (Gov't Ex. 6.) There is no inaccuracy, facial or otherwise, in this statement.

Defendant Tinnin's argument that the communication was unlawfully intercepted because of the incorrect designation order is likewise without merit. The fact is that a designated Criminal Division official authorized the application. Neither the expiration of Order No. 2758-2005 nor the issuance of Order No. 2887-2007 affected this fact. Thus, the failure to correctly identify the current designation order, "when in fact" the official was currently designated to authorize the application, does not warrant suppression. See Chavez, 416 U.S. at 571.

Further, considering the overall statutory scheme, inclusion of and reference to the revoked designation order did not render the interception unlawful. The application conformed to 18 U.S.C. § 2518, which requires an application to state the authority of the applicant, the identity of the officer making the application, and the identify of the officer authorizing the application. Id. § 2518(1), (1)(a). The designation orders at issue did not change the authority or

identity of the applicant or authorizing official; indeed, both orders granted the same Criminal Division officials the authority to approve wiretap applications. The application's mere reference to a revoked designation order, when a new order containing the same authorizations was in place, did not compromise the statutory scheme so as to make the interception unlawful.

**3. Defendant Tinnin's Statement**

Defendant Tinnin's sole basis for suppression of his statement is that the statement was obtained as a result of an unlawful wiretap, but the Court has found that the Tinnin wiretap was lawful. In addition, Defendant Tinnin spoke to law enforcement only after he was advised of his Miranda rights and agreed to waive those rights. Defendant Tinnin's motion to suppress his statement should be denied.

**B. Defendant Franks' Motions**

Defendant Franks originally moved to suppress statements and evidence and to dismiss the Indictment as insufficient. At the motions hearing, Defendant Franks conceded that there were no statements or any evidence against him obtained from search and seizure, and he orally withdrew those two motions. Thus, only the motion to dismiss the Indictment remains pending.

Defendant Franks argues that the Indictment does not allege sufficient facts to enable him to prepare a defense and does not set forth the essential elements of conspiracy. Federal Rule of Criminal Procedure Rule 7 requires an Indictment to "be a plain, concise, and definite written statement of the essential facts constituting the offense charged. . . . For each count, the indictment must give the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated." Fed. R. Crim. P. 7(c)(1).

> An indictment is legally sufficient on its face if it contains all of the essential elements of the offense charged, fairly informs the defendant of the charges

> against which he must defend, and alleges sufficient information to allow a defendant to plead a conviction or acquittal as a bar to a subsequent prosecution. An indictment will ordinarily be held sufficient unless it is so defective that it cannot be said, by any reasonable construction, to charge the offense for which the defendant was convicted.

United States v. Carter, 270 F.3d 731, 736 (8th Cir. 2001) (citations omitted). "It is well settled that in an indictment for conspiring to commit an offense—in which the conspiracy is the gist of the crime—it is not necessary to allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy." Wong Tai v. United States, 273 U.S. 77, 81 (1927); see also United States v. Starr, 584 F.2d 235, 237 (8th Cir. 1978) (holding that an indictment charging a conspiracy was not defective even though it failed to allege an essential element of the underlying substantive offense).

In the present case, Count 1 of the Indictment charges Defendant Franks with conspiring to distribute and to possess with the intent to distribute cocaine and cocaine base, during the time period from October 9, 2007 to December 3, 2007. The Indictment alleges that Defendant Franks and his co-defendants "knowingly and intelligently conspired with each other and with other persons . . . to distribute and possess with intent to distribute 50 grams or more of a mixture or substance containing a detectable amount of cocaine base ('crack')." The Court concludes that the Indictment adequately sets forth all of the essential elements of a conspiracy charge. It alleges an agreement to achieve an illegal purpose, that Defendant Franks knew of this agreement, and that he intelligently joined the conspiracy. The Indictment also alleges that one of the objects of the conspiracy was the distribution of crack cocaine. It was not necessary to specifically allege each and every element of the distribution offense in Count 1 in order to put Defendant Franks on notice of the charges against which he must defend.

Count 53 of the Indictment alleges that Defendant Franks, Defendant John Thomas Olson, and Defendant Tinnin aided and abetted each other in the knowing and intentional distribution of fourteen grams of crack cocaine on November 9, 2007, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B), and 18 U.S.C. § 2. Pursuant to 21 U.S.C. § 841(a)(1), it is unlawful to knowingly or intentionally "manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." Given that Count 53 tracks the statutory language of § 841(a)(1), the Court concludes that Count 53 is sufficiently alleged. See United States v. Sewell, 513 F.3d 820, 821 (8th Cir. 2008) ("An indictment is normally sufficient if its language tracks the statutory language.")

Because the Indictment is legally sufficient on its face, Defendant Franks' motion to dismiss the Indictment should be denied.[5]

**C. Defendant Robinson's Motions**

Defendant Robinson moves to suppress evidence seized pursuant to two search warrants, to suppress statements, and to suppress evidence obtained from electronic surveillance.

**1. Defendant Robinson's Statement to Officer Biederman**

With respect to his motion to suppress statements, Defendant Robinson concedes that Officer Biederman adequately advised him of his Miranda rights. (Def. Robinson Post-Hearing Mem. at 3.) He contends only that he did not voluntarily waive his rights, arguing specifically

[5] The original Indictment in this case was filed on December 4, 2007. Defendant Franks filed his motion to dismiss the Indictment on January 17, 2008. After the pretrial motions hearing, a Superseding Indictment was filed, but it did not include any additional charges against Defendant Franks. Accordingly, for the same reasons expressed herein regarding the original Indictment, the Court finds that the Superseding Indictment is sufficient.

that any waiver was procured by deceit because he did not know why he was arrested. Having reviewed the videotaped interrogation, the Court concurs with the Government and Defendant that he was properly advised of his Miranda rights. The Court therefore turns to the question of whether Defendant voluntarily waived those rights.

A law enforcement officer must advise a person of his Miranda rights before interrogating that person in a custodial setting. Illinois v. Perkins, 496 U.S. 292, 297 (1992). The person may choose to waive his rights and speak with the officer, but the waiver must be "made voluntarily, knowingly, and intelligently" for the statement to be admissible in court. Miranda v. Arizona, 384 U.S. 436, 444 (1966). A waiver can be either explicit or implicit. See North Carolina v. Butler, 441 U.S. 369, 373 (1979).

> An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the Miranda case. As was unequivocally said in Miranda, mere silence is not enough. That does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights. The courts must presume that a defendant did not waive his rights; the prosecution's burden is great; but in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated.

Id. In the present case, Defendant Robinson did not expressly waive his Miranda rights, but he spoke with Officer Biederman after having been advised of his rights. The question, then, is whether his actions and words implied a knowing and voluntary waiver of his rights.

Whether a confession is voluntary must be judged by an examination of the totality of the circumstances and whether the will of the defendant was overcome. Colorado v. Spring, 479 U.S. 564, 573-74 (1987); see also Haynes v. Washington, 373 U.S. 503, 513-14 (1963) (citation

omitted). "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." United States v. Hyles, 479 F.3d 958, 966 (8th Cir. 2007) (quotation omitted). Two factors must be considered when determining whether a defendant's will was overborne: the conduct of law enforcement and the defendant's ability to resist pressure to confess. United States v. Jorgensen, 871 F.2d 725, 729 (8th Cir. 1989) (citing Colorado v. Connelly, 479 U.S. 157 (1986)). A questioning tactic such as deception does not render a statement involuntary unless the deception vanquished the will of the defendant. Jenner v. Smith, 982 F.2d 329, 334 (8th Cir. 1993) (citations omitted).

The Court does not find that Officer Biederman or "Jason" engaged in any deceptive or coercive tactics, but even if they did to a small degree, Defendant Robinson's will was certainly not overborne, and his capacity for self-determination was not critically impaired. At the beginning of the interview, Officer Biederman told Defendant Robinson that he would explain the basis for Defendant Robinson's arrest after he administered a Miranda warning. After doing so and ensuring that Defendant Robinson understood his rights, Officer Biederman asked him if he wanted to talk about the "issue." Defendant Robinson did not say yes or no, only that he did not know what "the situation" was. This statement did not indicate that Defendant Robinson was invoking a Miranda right; rather, he was merely seeking information from Officer Biederman before agreeing to speak. Officer Biederman then said that Defendant Robinson would have to agree to talk with him before they could discuss substantive matters such as the basis for Defendant's arrest. This was not deceptive or coercive. If Officer Biederman had begun to discuss the case, he would have risked engaging in conduct likely to elicit an incriminating

response. Moreover, it is evident from the video recording that Defendant Robinson's will was not overcome by this tactic; indeed, Defendant Robinson's will remained intact throughout the interview.

When Defendant Robinson repeated that he did not know what Officer Biederman wanted to talk about, Officer Biederman did not press the point, nor did he threaten to withhold information unless Defendant Robinson agreed to talk. Instead, Officer Biederman suggested that Defendant Robinson ask him a few questions, to which Defendant Robinson assented and asked why he was in custody. Officer Biederman told Defendant Robinson the truth: that he was taken into custody pursuant to a federal arrest warrant.

Officer Biederman then changed the subject and asked Defendant Robinson typical background questions, which Defendant Robinson answered. When Officer Biederman subtly changed the course of the conversation to questions about Defendant Robinson's involvement with selling crack cocaine, Defendant Robinson continued to answer the questions. His course of conduct implied that he had waived his Miranda rights.

Defendant Robinson freely spoke with Officer Biederman for more than an hour. He never indicated that he did not understand his rights, and he never asked any questions regarding his rights. He never asked for an attorney or sought to cease questioning. Such considerations are relevant in determining voluntariness. See Jenner, 982 F.2d at 334. In addition, Defendant Robinson's general demeanor was relaxed and confident. Although at times he appeared distressed about his situation, it was no more than would be expected. These details further indicate that Defendant Robinson was not deceived or coerced, and that his will was not overborne.

In conclusion, the Government has met its burden to show that Defendant Robinson's statement to Officer Biederman was voluntary, knowing, and intelligent. To the extent Officer Biederman's tactics could be characterized as deceptive or manipulative, the tactics were not coercive and did not overcome Defendant Robinson's will. Accordingly, Defendant Robinson's motion to suppress the statement should be denied.

**2. The Search Warrants and Arrest Warrant**

Defendant Robinson asks the Court to examine the arrest warrant and the search warrant for 812 44th Avenue North, Apartment 2, Minneapolis, Minnesota, for probable cause. He makes no particular argument regarding the deficiency of the warrants, but "leave[s] it to the discretion of the Court whether, based upon the record, the appropriate probable cause existed . . . ." (Def. Robinson Post-Hearing Mem. at 6.)

The arrest warrant was issued based on the indictment of Defendant Robinson by a grand jury. (Gov't Ex. 3.) The Fourth Amendment's probable cause requirement for an arrest is satisfied when a grand jury returns an indictment. Kalina v. Fletcher, 522 U.S. 118, 129 (1997) (citations omitted). Defendant Robinson's challenge to the arrest warrant is patently without merit.

As to the search warrant for 812 44th Avenue North, Apartment 2 (Gov't Ex. 4), the Court finds it was also supported by probable cause. When an issuing court relies solely on an affidavit to determine whether probable cause exists for a warrant, the reviewing court may consider "only that information which is found within the four corners of the affidavit . . . in determining the existence of probable cause." United States v. Leichtling, 684 F.2d 553, 555 (8th Cir. 1982). The affidavit in the present case stated that police officers wanted to search the

residence for controlled substances, firearms, and various related items. The affiant, Officer Jeff Waite, attested that he and other officers had gone to the address, a known address for Defendant Robinson, to arrest him pursuant to an arrest warrant. A female individual let the officers into the apartment and indicated they could find Defendant Robinson in the back of the apartment. Once inside the apartment, officers noticed a small digital scale and some crack cocaine on a plate. They also saw a sawed-off shotgun in an open, black garbage bag lying about two feet from where they found Defendant Robinson. The officers froze the apartment while Officer Waite applied for the search warrant. The Court concludes that the information provided in Officer Waite's affidavit provided ample probable cause to search 812 44th Avenue North, Apartment 2.

As to the search warrant for 1522 LaSalle Avenue South, Apartment 201 (Gov't Ex. 5), Defendant Robinson argues that no probable cause existed for the warrant because the factual basis for the warrant came from the statement he gave to Officer Biederman. However, the Court has found that Officer Biederman did not violate Defendant Robinson's constitutional rights in obtaining the statement, and thus, the statement was appropriately used as a basis for the warrant.

**3. Electronic Surveillance**

Defendant Robinson asks the Court to suppress evidence obtained pursuant to the Randle and Tinnin wiretaps because (1) there was no probable cause for the wiretaps; (2) the Government failed to show necessity for the wiretaps; and (3) the monitors failed to minimize the interceptions. The Court will proceed to the merits of the issues without deciding whether Defendant Robinson has standing to contest the wiretaps.

### a. Probable Cause

"The probable cause required for allowing electronic interception of wire communications is the same as that required by the Fourth Amendment for a search warrant." United States v. Milton, 153 F.3d 891, 894 (8th Cir. 1998). An affidavit in support of a wiretap application must include facts showing that (1) the person had committed or was going to commit a particular crime; (2) a communication pertaining to that crime would be intercepted; and (3) the targeted phone number had a nexus to the crime or was often used by the suspect. Id. In this inquiry, the Court is "bound to consider only the facts contained within the four corners of the affidavit." Id.

In the present case, Agent Meyer's affidavits provided a wealth of probable cause for the wiretaps. With respect to the Randle wiretap, the affidavit showed that Timothy Randle had committed or would commit the crime of narcotics trafficking; that Timothy Randle had utilized and would continue to utilize his cellular phone to commit numerous crimes, including distribution of a controlled substance and conspiracy; and that the interception of wire communications would provide admissible evidence such as the location of resources, identities of co-conspirators, the nature and scope of the conspiracy, and price and quantity information. It is difficult to fathom what additional information Agent Meyer could have provided in his forty-one page affidavit.

Similarly, in support of the Tinnin wiretap, Agent Meyer provided not only his first affidavit but an additional twenty-one page affidavit specific to Defendant Tinnin. The second affidavit demonstrated that Defendant Tinnin had committed or would commit multiple federal crimes such as conspiracy to distribute crack cocaine and distribution of crack cocaine, among

others; that Defendant Tinnin was using and would continue to use his cellular phone in connection with these crimes; and that the interception of calls to and from Defendant Tinnin's phone would yield evidence such as the location of resources, identities of co-conspirators, the nature and scope of the conspiracy, price and quantity information, and the distribution of proceeds.

**b. Necessity**

The Court has already concluded that Agent Meyer's affidavit for the Tinnin wiretap sufficiently established that normal investigative techniques were tried and failed and that other techniques were not likely to succeed. The same is true for the Randle wiretap. Agent Meyer explained in his affidavit how law enforcement had used confidential informants, controlled buys, surveillance, pen registers, and search warrants in the investigation of Timothy Randle. He also described the limited success of such efforts. Specifically, the CIs were able to purchase only small amounts of crack cocaine, and searches of Timothy Randle's residence yielded no crack cocaine and only minimal evidence of narcotics trafficking. Surveillance was not effective due to counter-surveillance techniques. Mobile tracking devices did not provide the identity of co-conspirators or reveal the full scope of the conspiracy. Because traditional investigative techniques had not revealed the scope of the conspiracy, the sources of narcotics, the identities of customers, the management and disposition of narcotics sale proceeds, or the identities of co-conspirators, Agent Meyer concluded that electronic surveillance was the only method likely to achieve the goals of the investigation. The Court concludes that Agent Meyer adequately demonstrated necessity for the Randle wiretap.

**c. Minimization**

Defendant Robinson contends that two minutes was too long a period of time for monitors to determine whether a call pertains to criminal activity. He admits that he has no authority to support his position.

Under 18 U.S.C. § 2518(5), surveillance "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception." Whether wiretap monitors adequately minimize non-pertinent calls is a question of objective reasonableness. Macklin, 902 F.2d at 1328 (citations omitted).

Defendant Robinson has provided no evidence or argument that the minimization procedure in this case was not objectively reasonable. He has not even identified a two-minute call for the Court to review. The only evidence before the Court is that the monitors could listen to a call for up to two minutes in order to determine whether it was criminal in nature. When the call neared two minutes in length, or if the monitor determined that the call was not pertinent, he or she minimized the call. Monitors were permitted to spot-check ongoing, minimized conversations to ascertain whether they had become criminal in nature. This minimization procedure has been "reviewed favorably" by the Eighth Circuit. See United States v. Ozar, 50 F.3d 1440, 1448 (8th Cir. 1995) (citing United States v. Smith, 909 F.2d 1164, 1166 (8th Cir. 1990); United States v. Losing, 560 F.2d 906, 909 n.1 (8th Cir. 1977); Daly, 535 F.2d at 441-42); see also United States v. Almada-Cota, Crim. No. 07-219 (JNE/AJB), 2007 WL 4372965, at *12 (D. Minn. Dec. 6, 2007). Consequently, the Court concludes that two minutes was an objectively reasonable amount of time in which to determine whether a call pertained to criminal activity.

Based upon all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant Marco Orlando Tinnin's Motion to Suppress Statements (Doc. No. 183) be **DENIED**;
2. Defendant Marco Orlando Tinnin's Motion to Suppress Electronic Surveillance and Wiretapping (Doc. No. 262) be **DENIED**;
3. Defendant Danta Franks' Motion to Suppress Admissions or Confessions (Doc. No. 313) be deemed **WITHDRAWN**;
4. Defendant Danta Franks' Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 314) be deemed **WITHDRAWN**;
5. Defendant Danta Franks' Motion to Dismiss Indictment as Insufficient (Doc. No. 356) be **DENIED**;
6. Defendant Darrel Robinson's Motion to Suppress Evidence from Search and Seizure (Doc. No. 215) be **DENIED**;
7. Defendant Darrel Robinson's Motion to Suppress Statements (Doc. No. 216) be **DENIED**; and
8. Defendant Darrel Robinson's Motion to Suppress Electronic Surveillance Evidence (Doc. No. 217) be **DENIED**.

Dated: March 14, 2008

s/ Susan Richard Nelson
SUSAN RICHARD NELSON
United States Magistrate Judge

Pursuant to D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by

filing with the Clerk of Court, and serving all parties by **March 31, 2008**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within ten days after service thereof. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.